Troy M. Mueller (State Bar No. 284535)
  tmueller @tmmla.com
LAW OFFICES OF TROY M. MUELLER
2355 Westwood Boulevard #636
Los Angeles, California 90064
Telephone: (213) 282-6518

Attorneys for Plaintiff
ALEXSO, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| ALEXSO, INC., a California corporation,<br><br>               Plaintiff,<br><br>    vs.<br><br>HOOTAN MELAMED, an individual; ROXSAN PHARMACY, INC., a California corporation; SHAHLA "SHANA" MELAMED, an individual; PRESTIGE PROFESSIONAL PHARM LLC, an Oregon limited liability company; LOUIS TAYLOR, an individual; VOYAGE VENTURE, LLC, an Oregon limited liability company; VOYAGE VENTURE SUPA SLYDES, LLC, an Oregon limited liability company; PRISCILA VILCHIS, an individual; ELITE MANAGEMENT SOLUTIONS, INC., a California corporation; JAMES PETERSON, an | Case No.  2:18-cv-772<br><br>**PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO 18 U.S.C. § 1961, et seq. (RICO)**<br><br>**Jury Trial Demanded** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

individual; MCNAA, INC., a
Nevada corporation; RUDY
PULIDO, an individual; ALLIED
SOLUTIONS BILLING AND
COLLECTIONS, INC., a
California corporation; TOM
MANSOUR, an individual;
PROGRESSIVE PHARMACY
SOLUTIONS, Inc., a California
corporation; LEADER MEDICAL
SOLUTIONS, a California
corporation; TURNING POINT
SOLUTIONS, INC., a California
corporation; and DOES 1 through
30,

                Defendants.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

1

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION..................................................4

II.     JURISDICTION AND VENUE...........................................5

III.    PARTIES ..............................................................................5

        A.      Pharmacy Defendants ...........................................5

        B.      Marketer Defendants.............................................7

        C.      Doctor Defendants ..............................................10

VI.     DEFENDANTS' CRIMINAL SCHEME TO DEFRAUD
        PATIENTS AND THEIR GOVERNMENT INSURERS .........11

        A.      A Legal Framework Exists to Promote Honest Healthcare
                Services ...............................................................11

        B.      Defendants Design a Plan to Violate the Legal
                Framework to Manipulate Retail-Level Market Activity...............13

        C.      Defendants Conceal Their Activity.......................15

        D.      Melamed, Pharmacies, Marketers, and Doctors Benefit to the
                Detriment of Patients' Trust and Tax Payers Dollars...................18

        E.      Melamed Gets Caught ...........................................18

        F.      Innocent Alexso's Sales of Terocin Patch Plummet .......................18

V.      ALLEGATIONS COMMON TO RICO COUNTS ...................21

        A.      Culpable Person(s) ...............................................21

        B.      Enterprise.............................................................26

        C.      Interstate or Foreign Commerce.........................28

        D.      Racketeering Activity ..........................................29

        E.      Pattern .................................................................30

        F.      Standing/Causation .............................................40

VI.     COUNT 1: § 1962(c) .......................................................41

VII.    COUNT 2: § 1962(d) .......................................................43

ALEXSO, INC'S COMPLAINT FOR DAMAGES

Plaintiff, Alexso, Inc., by and though its undersigned attorneys, hereby prays to this honorable Court for relief and remedy based on the following:

## I.      SUMMARY OF THE ACTION

1.      In June of 2016, Defendant, Hootan Melamed, a pharmacist licensed in several States, and an interest holder in a number of entities related to the pharmaceutical industry, was indicted for his involvement in a scheme to bribe doctors to send prescriptions to pharmacies of Mr. Melamed's choosing.  Mr. Melamed acted in concert with other Defendants whom he paid to negotiate and pay these bribes.

2.      Mr. Melamed attempted to conceal this activity by having the pharmacies benefitting therefrom pay him indirectly through his mother, Defendant, SHAHLA Melamed, or through one of his "marketers," Louis Taylor.  From this money, Mr. Melamed paid the other Defendants and perpetuated the criminal scheme which Defendants conducted beginning as late at August of 2012 and ending as early as February of 2016.

3.      One of the products prescribed in the Defendants' scheme was Alexso, Inc.'s Terocin Patch, a product already profitable in its own right. Alexso, Inc. is not a pharmacy, but rather is a wholesaler that provides products to pharmacies.  Alexso, Inc. files this complaint because while Mr. Melamed's chosen pharmacies were cashing in on the criminal scheme, the result of Mr. Melamed's implication of the Terocin Patch, has cost Alexso, Inc. millions of dollars in sales.

## II.    JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(c).

5.    Venue in the Central District is proper under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(c) because Defendant Melamed, is subject to personal jurisdiction in this district and resides there.

## III.    PARTIES

6.    Plaintiff ALEXSO, INC. ("ALEXSO") is a corporation organized and existing under the law of the State of California with its principal place of business located at 2317 Cotner Avenue, Los Angeles, California 90064. ALEXSO is a wholesale business selling both prescription and over the counter pharmaceutical products to pharmacies and distributors.

7.    Defendant HOOTAN MELAMED ("MELAMED") is an individual, residing at 2164 Stratford Circle, Bel Air, California 90077. MELAMED is a pharmacist licensed or formerly licensed in the States of California, Nevada, Louisiana, Tennessee, Maryland, Mississippi, Arizona, and New York.

### A.    *Pharmacy Defendants*

8.    The persons listed in the following paragraphs 9 through 13 of this Complaint shall hereafter be referred to collectively as the "Pharmacy Defendants." Pharmacy Defendants were at all relevant times and now are engaged in the business of selling pharmaceutical products to end-consumers.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

9.     Defendant ROXSAN PHARMACY, INC. ("ROXSAN") is a corporation organized and existing under the law of the State of California with its principal place of business located at 465 North Roxsbury Drive, Beverly Hills, California 90210.

10.    Defendant SHAHLA "SHANA" MELAMED ("SHAHLA") is an individual, residing at 3209 Hutton Drive, Beverly Hills, California 90210. SHAHLA is a pharmacist formerly licensed in the State of California, who, until approximately August of 2015, was a shareholder of ROXSAN. SHAHLA is MELAMED's mother.

11.    PRESTIGE PROFESSIONAL PHARM LLC ("PRESTIGE") doing business as Portland Professional Pharmacy is a limited liability company organized and existing under the law of the State of Oregon with its principal place of business located at 11711 North East Glisan Street, Portland, Oregon 97220.

12.    Plaintiff is informed and believes and thereon alleges that some of Defendants, DOES 1 through 10, inclusive, are pharmacies and that such DOE Defendants have sold products marketed to them by Marketer Defendants (defined below).  The true names, whether corporate, individual, or otherwise, of Defendants DOES 1-10, inclusive, are presently unknown to ALEXSO.  ALEXSO therefore sues said Defendants by such fictitious names and will seek leave to amend this complaint to show their true names and capacities when the same have been ascertained.

13.    Other Pharmacy Defendants, not named as parties herein include the following:

ALEXSO, INC'S COMPLAINT FOR DAMAGES

a. NEW AGE PHARMACEUTICALS, INC. ("NEW AGE") is a corporation organized and existing under the law of the State of California with its principal place of business located at 1147 South Beverly Drive, Suite B, Beverly Hills, California 90035. NEW AGE is believed to currently be out of business.

**B.  *Marketer Defendants***

14.  The following persons listed in paragraphs 15 through 29 of this Complaint shall hereafter be referred to collectively as the "Marketer Defendants."  Marketer Defendants were at all relevant times and now are engaged in the business of soliciting doctors to prescribe pharmaceutical products to Pharmacy Defendants.  Specifically, Marketer Defendants bribed doctors to write favored prescriptions.

15.  LOUIS TAYLOR is an individual residing in the State of Oregon doing business in and with the State of California.

16.  VOYAGE VENTURE, LLC ("VOYAGE") is a limited liability company organized under the laws of the State of Oregon with its principal place of business located at 7427 Southwest Coho Court, Suite 200, Tualatin, Oregon 97062.  LOUIS TAYLOR controls VOYAGE.

17.  VOYAGE VENTURE SUPA SLYDES, LLC ("SUPA") is a limited liability company organized under the laws of the State of Oregon with its principal place of business located at 25749 Southwest Canyon Creek Road # 800, Wilsonville, Oregon 97070.  LOUIS TAYLOR controls SUPA.

18.  PRISCILA VILCHIS is an individual residing in the State of California doing business in and with the State of California.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

19.   ELITE MANAGEMENT SOLUTIONS, INC. ("ELITE") is a corporation organized under the laws of the State of California with its principal place of business located at 6454 Van Nuys Boulevard #150-46, Van Nuys, California 91401.  PRISCILA VILCHIS controls ELITE.

20.   JAMES PETERSON is an individual residing in the State of California and doing business in and with the State of California.

21.   MCNAA, INC. ("MCNAA") is a corporation organized under the laws of the State of Nevada with its principal place of business located at 1 Wayside, Newport Coast, California 92657.  JAMES PETERSON controls MCNAA.

22.   RUDY PULIDO is an individual residing the State of California.

23.   ALLIED SOLUTIONS BILLING AND COLLECTIONS, INC. ("ALLIED") is a corporation organized under the law of the State of California with its principal place of business located at 1314 East 29th Street, Signal Hill, California 90755.  RUDY PULIDO controls ALLIED.

24.   TOM MANSOR is an individual residing in the State of California.

25.   PROGRESSIVE     PHARMACY     SOLUTIONS,     INC. ("PROGRESSIVE") is a corporation organized under the laws of the State of California with its principal place of business located at 171 C. Avenue Suite C, Coronado, California 92118.     TOM MANSOR controls PROGRESSIVE.

26.   LEADER MEDICAL SOLUTIONS ("LEADER") is a corporation organized under the laws of the State of California with its principal place

of business located at 2121 Virginia Avenue, Unit 111, Santa Monica, California 90404.

27.     TURNING POINT SOLUTIONS, INC. ("TURNING POINT") is a corporation organized under the laws of the State of California with its principal place of business located at 269 South Beverly Drive, Suite 622, Beverly Hills, California 90212.

28.     Plaintiff is informed and believes and thereon alleges that some of Defendants, DOES 11 through 20, inclusive, are marketers of pharmaceutical products to Pharmacy Defendants.  The true names, whether corporate, individual, or otherwise, of Defendants DOES 2-20, inclusive, are presently unknown to ALEXSO.  ALEXSO therefore sues said Defendants by such fictitious names and will seek leave to amend this complaint to show their true names and capacities when the same have been ascertained.

29.     Other Marketer Defendants, not named as parties herein include the following:

    a. JEAN FRANCOIS PICARD, an individual doing business in the State of California.

    b. C.A.S.E., LLC, a business entity of unknown origin doing business in the State of California.

    c. JOHN PANGELINAN is an individual residing in the State of California.

    d. BROAD MED, INC. is a corporation organized under the laws of the State of California with its principal place of business located

at 6812 Auburn Drive, Huntington Beach, California 92647. BROAD MED, INC. is controlled by JOHN PANGELINAN.

    e. JONATHAN PENA doing business at JP Medical Marketing Services is an individual residing in the State of California doing business at 1633 Eastleigh Avenue, Hacienda Heights, California 91745.

    f. GREYSON COMPANY, LLC ("GREYSON") is a limited liability company organized under the laws of the State of Nevada with its principal place of business located at 1 Wayside, Newport Coast, California 92657. JAMES PETERSON controls GREYSON.

## C. *Doctor Defendants*

30. The following persons listed in paragraphs 31 through 32 of this Complaint shall hereafter be referred to collectively as the Doctor Defendants. Doctor Defendants were at all relevant times and are now engaged in accepting payment for directed prescriptions from Marketing Defendants

31. Plaintiff is informed and believes and thereon alleges that some of Defendants, DOES 21 through 30, inclusive, are doctors and that such DOE Defendants have accepted money from Marketing Defendants for prescriptions filled at Pharmacy Defendants. The true names, whether corporate, individual, or otherwise, of Defendants DOES 21-30, inclusive, are presently unknown to ALEXSO. ALEXSO therefore sues said Defendants by such fictitious names and will seek leave to amend this

complaint to show their true names and capacities when the same have been ascertained.

32.　　Other Doctor Defendants, not named as parties herein, include the following:

　　　a. PHONG HUNG TRAN is an individual residing in the State of California.

33.　　Plaintiff is informed and believes and thereon alleges that at all times relevant hereto each of the Defendants was the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of the remaining Defendants and was at all times acting within the scope of such agency, affiliation, alter-ego relationship, and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts of conduct alleged, with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately caused thereby.

## IV.　DEFENDANTS' CRIMINAL SCHEME TO DEFRAUD PATIENTS, AND THEIR GOVERNMENT INSURERS

### A.　*A Legal Framework Exists to Promote Honest Healthcare Services*

34.　　Physicians, including medical doctors and chiropractors, owe a fiduciary duty to their patients, which requires them to act in their patients' best interests, and not for their own professional, pecuniary, or personal gain.

35.   The California Workers' Compensation System ("CWCS") requires that employers in California provide workers' compensation benefits to their employees for qualifying injuries sustained in the course of their employment. Under the CWCS, all claims for payments for services or benefits provided to the injured employee, including medical and legal fees, are billed directly to, and are paid by, the insurer.

36.   CWCS benefits are administered by the employer, an insurer, or a third party administrator. The CWCS required claims administrators to authorize and pay for medical care that was "reasonably required to cure or relieve the injured worker from the effects of his or her injury."

37.   California law, including but not limited to the California Business and Professions Code, the California Insurance Code, and the California Labor Code, prohibits the offering, delivering, soliciting, or receiving of anything of value in return for referring a patient goods or services paid for under the CWCS.

38.   The United States offers a workers' compensation program to provide medical care to federal workers who suffer work-related injuries or occupational diseases.   The program was administered by the Office of Workers' Compensation Programs. Claims are submitted to the Department of Labor for adjudication and payment.

39.   Both California and the federal workers' compensation benefits included prescription medications prescribed by a doctor. Compound creams are specialty medications prescribed for patients who are unable to take medications in their standard formulations (for example, tablets, pills, or

ALEXSO, INC'S COMPLAINT FOR DAMAGES

injections), for medications that must be absorbed through the skin, or where the specific combination of medicines is not available. Compound pharmacies could custom-mix the prescribed medicines into a cream to be dispensed to the patient

40.    Both California and the federal workers' compensation benefits included coverage for DME prescribed by a doctor. DME is any equipment that provides therapeutic benefits to a patient in need because of certain medical conditions and/or illnesses.    An Inferential Unit ("IF Unit") was a device that provides low-level electrical stimulation to a body part to encourage healing.

**B.    Defendants Design a Plan to Violate the Legal Framework to Manipulate Retail-Level Market Activity**

41.    It was Defendants' goal to fraudulently obtain money from health care benefit programs by submitting claims for prescription pharmaceuticals and DME that were generated through a secret pattern of bribes to doctors (and those acting with them and on their behalf), to induce the doctors to refer patients to particular pharmacies and DME providers, in violation of the doctors' fiduciary duty to their patients.

42.    Beginning on a date unknown and continuing through at least June 2016, within the States of California, Nevada, Oregon, and elsewhere, defendants MELAMED, Marketer Defendants, Pharmacy Defendants, Doctor Defendants, and others did knowingly and intentionally conspire together and with each other and with others to:

        i.    commit Health Care Fraud, that is, to knowingly and with the intent to defraud execute a material scheme to defraud

1            a health care benefit program, and to obtain by means of

2            materially false and fraudulent pretenses, representations,

3            and promises, any of the money and property owned by,

4            and under the custody and control of a health care benefit

5            program, in connection with the delivery of and payment

6            for health care benefits, items, and services, in violation of

7            Title 18, United States Code, Section 1347;

8      ii.   commit Honest Services Mail Fraud, that is, to knowingly

9            and with the intent to defraud, devise and participate in a

10           material scheme to defraud and to deprive patients of the

11           intangible right to a doctor's honest services and to cause

12           mailing in furtherance thereof, in violation of Title 18,

13           United States Code, Sections 1341 and 1346; and

14     iii.  violate the Travel Act, that is, to use and cause to be used

15           facilities in interstate commerce with intent to promote,

16           manage, establish, carry on, distribute the proceeds of, and

17           facilitate the promotion, management, establishment,

18           carrying on, and distribution of the proceeds of an unlawful

19           activity, that is, commercial bribery in violation of

20           California law, and, thereafter, to promote and attempt to

21           perform acts to promote, manage, establish, carry on,

22           distribute the proceeds of, and facilitate the promotion,

23           management, establishment, carrying on, and distribution

24

25

1  of the proceeds of such unlawful activity, in violation of

2  Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

3

4  **C.   *Defendants Cover Their Activity***

5  43.   The conspirators used the following manner and means in

6  pursuit of their fraudulent purpose:

7  44.   It was a part of the conspiracy that defendants MELAMED,

8  Marketer Defendants, and other co-conspirators, knowing that the payment

9  of per-patient referral fees was unlawful, paid doctors to recommend certain

10  pharmaceutical compounds and refer workers' compensation patients to

11  specific providers for those goods and services, including to Pharmacy

12  Defendants for prescription pharmaceuticals and to other providers in

13  which the co-conspirators had financial interests for other goods and

14  services.

15  45.   It was a further part of the conspiracy that Doctor Defendants,

16  knowing that receiving a per-patient referral fee was unlawful, agreed to

17  accept per-patient bribes from the co-conspirators to refer workers'

18  compensation patients to companies owned by MELAMED and his

19  coconspirators or in which Defendants and each of them had an interest.

20  46.   It was a further part of the conspiracy that the co-conspirators

21  paid or accepted specific bribe and kickback amounts for specific kinds of

22  prescriptions, including: between $200-250 per IF Unit referral, $150-200

23  for each Flurbiprofen cream prescription, $150 for each Gabapentin cream,

24  and $50 per Terocin patch.

25

47.   It was a further part of the conspiracy that the co-conspirators concealed from patients, and intended to cause the Marketer Defendants, to conceal payments made to doctors for referring patients to companies owned by the co-conspirators or in which they had an interest, in violation of the doctors' fiduciary duty to their patients.

48.   It was a further part of the conspiracy that the Defendants and each of them obscured the true nature of their financial relationships in order to conceal their corrupt payments for patient referrals, including by entering sham agreements to purportedly lease office space or provide marketing services, when in reality the corrupt payments were made in exchange for, or to induce, the referral of patients.

49.   It was a further part of the conspiracy that the Defendants and each of them, knowing that the payment of per-patient referral fees was unlawful, inserted intermediaries (referring to them as "marketers" or "marketing companies") to hide and obscure the flow of payments from providers to doctors, when in reality the payments were unlawful volume-based, per-patient referral fees.

50.   It was a further part of the conspiracy that the Defendants and each of them obscured the true nature of their financial relationships in order to conceal their corrupt payments for patient referrals, including by creating separate companies in the names of nominees and straw owners, to pay and receive kickback and bribe money.

51.   It was a further part of the conspiracy that, knowing that per-patient referral fees were unlawful, the Defendants and each of them

ALEXSO, INC'S COMPLAINT FOR DAMAGES

disguised their bribes and kickbacks to doctors by providing gift cards, vacations, sports tickets, cash, or patient referrals.

52.   It was a further part of the conspiracy that MELAMED, after paying doctors and marketers kickbacks and bribes to prescribe compound creams, then filled the prescriptions himself through NEW AGE, or sent those prescriptions to Pharmacy Defendants to be filled in exchange for a further kickback from those pharmacies.

53.   It was a further part of the conspiracy that the Defendants and each of them discussed via telephone calls, emails, and in-person meetings the workers' compensation patients who had been corruptly referred for goods and services in exchange for kickbacks.

54.   It was a further part of the conspiracy that the Defendants and each of them utilized interstate facilities, including cellular telephones and email, in order to coordinate the referral of patients for goods and services, knowing that such referrals were predicated on unlawful per-patient kickback payments.

55.   It was a further part of the conspiracy that the Defendants and each of them utilized the mails as an essential part of their fraudulent scheme, including by mailing bills to insurance carriers, and mailing prescription pharmaceuticals and DME to patients.

56.   It was a further part of the conspiracy that Defendants and each of them billed, and caused insurers to bill, for services provided to patients that the Defendants and each of them had procured by paying bribes and kickbacks.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

57.     It was a further part of the conspiracy that Defendants and each of them concealed from insurers and patients the material fact of the kickback arrangements, which were in violation of California state law, that led to the referrals.

**D.     Melamed, Pharmacies, Marketers, and Doctors Benefit to the Detriment of Patients' Trust and Tax Payer's Dollars**

58.     Using the manners and means described above, defendants submitted and caused to be submitted claims of over $27 million for pharmaceutical prescriptions and over $7.6 million in DME prescriptions procured through the payment of bribes and kickbacks.

**E.     Melamed Gets Caught**

59.     On June 16, 2016, MELAMED was indicted in the United States District Court for the Southern District of California, Case Number 16-CR-1409H, for the conduct described in the preceding paragraphs.

60.     A true and correct copy of that indictment is attached hereto as Exhibit A.

**F.     Innocent Alexso's Sales of Terocin Patch Plummet**

61.     ALEXSO is a wholesale pharmaceutical company which supplies pharmacies with pharmaceutical products.  It does not engage in business with any doctor, patient, or insurer at the retail level and it does not formulate or otherwise compound products.

62.     By comparison, the Defendants' illegal activity, as stated above, concerns downstream market activity which attempts to manipulate where products are purchased at retail and how they are formulated and compounded.

63.    Unfortunately, MELAMED is a shareholder of ALEXSO, however he stepped down as President of ALEXSO in February of 2016 and has had no control over ALEXSO in any way since approximately May 10, 2016 when he signed an agreement resigning from all officer and director positions, assigning the right to vote his shares, and declaring himself an inactive shareholder.

64.    As a result of MELAMED's indictment, some of ALEXSO's customers have wrongly perceived an association between ALEXSO's products and MELAMED's criminal activity, in substantial part because at least one of ALEXSO's products, the popular Terocin patch, was being recommended by defendants in their scheme.

65.    The Terocin Patch is a trademarked product of ALEXSO, registered with the United States Food and Drug Administration by National Drug Code 50488-1001-1.  It is exclusively sold by ALEXSO.

66.    The Terocin Patch is an over-the-counter, topical lidocaine patch used for the temporary relief of minor aches and muscle pains associated with arthritis, simple backache, strains, muscle soreness, and stiffness.  As such, it is particularly useful for workplace injury applications.

67.    Terocin Patch came to market on or about July 5, 2013, after ALEXSO's successful launch of the product as a lotion on or about October 15, 2010.

68.    Since 2013, Terocin Patch has enjoyed a competitive advantage in being listed by First Data Bank, the sole pricing company that the State of California uses to determine whether or not to reimburse pharmaceutical

ALEXSO, INC'S COMPLAINT FOR DAMAGES

products.  Upon information and belief, First Data Bank is not listing any new patches.

69.   ALEXSO invested heavily in advertising the Terocin Patch, which has name recognition in the marketplace due to ALEXSO's investment in educating the market about this product.  ALEXSO has spent approximately $65,000 per year advertising Terocin Patch over the course of the last three years.

70.   As a result of Terocin Patch's functionality and its being (i) exclusive to ALEXSO; (ii) properly registered; (iii) listed with First Data Bank; and (iv) the subject of ALEXSO marketing efforts, Terocin Patch has been a profitable and popular product.

71.   However, orders for ALEXSO's popular Terocin Patch have declined in the wake of MELAMED's indictment. In the six months following MELAMED's indictment in June of 2016, the average number of monthly units of Terocin Patch sold by ALEXSO declined by 7,536 units from the average number of monthly units of Terocin Patch sold by ALEXSO in the six months prior to June 2016.   The average wholesale price of one unit of Terocin Patch is $30.   Thus, ALEXSO suffered an injury of $1,356,480 as to the Terocin Patch in just the six months after MELAMED's criminal enterprise became public.

72.   Also since MELAMED's indictment in June 2016, one of ALEXSO main competitors, Pharmaceutica North America, has exited the market.  While this should have dramatically improved ALEXSO's sales,

the opposite is true.  ALEXSO sales of the Terocin Patch have lagged significantly since MELAMED's indictment.

73.    Based upon ALEXSO's historical sales, ALEXSO estimates between three and five million dollars in sales have been lost due to the cloud Defendants' activity has created surrounding ALEXSO's products.

# V.    ALLEGATIONS COMMON TO RICO COUNTS

74.    A plaintiff may bring a private civil action for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). See 18 U.S.C. § 1964.

75.    The RICO statute makes it unlawful for a person to invest in, control, acquire, conduct, associate with, or conspire to engage in an enterprise affecting interstate commerce through a pattern of racketeering activity. See 18 U.S.C. § 1962.

76.    To recover under any RICO claim a plaintiff must prove the existence of (1) a culpable person and (2) an enterprise, (3) affecting interstate commerce, (4) through a pattern, (5) of racketeering activity (known as "predicate acts"), (6) causing injury to the plaintiff's "business or property" by the conduct constituting the violation.  See *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir.2005).

## A. Culpable Person(s)

77.    RICO defines a "person" as an "entity capable of holding a legal or beneficial interest in property."

78.    Defendants named in this complaint are divided into three groups based upon their area of involvement.  All of them are culpable

persons and all financially benefitted from their association with, and involvement in the racketeering activity.

### 1. Manager: Melamed

79. Defendant, Hootan MELAMED is an individual, older than 18 years of age, capable of holding a legal or beneficial interest in property. He conceived of the enterprise, initiated it by engaging Marketer Defendants to bribe Doctors Defendants, and managed the enterprise by directing prescriptions derived from Marketer Defendants' conduct to Pharmacy Defendants.

### 2. Operators: Marketer Defendants

80. LOUIS TAYLOR is an individual, older than 18 years of age, capable of holding a legal or beneficial interest in property. Mr. Taylor directed VOYAGE and SUPA. to accept money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax. Mr. Taylor also accepted money from Pharmacy Defendants to help MELAMED conceal his interest in such money and/or directed VOYAGE and SUPA to do so.

81. VOYAGE is a limited liability company capable of holding a legal or beneficial interest in property. VOYAGE accepted money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

82. SUPA is a limited liability company capable of holding a legal or beneficial interest in property. SUPA accepted money from MELAMED to

ALEXSO, INC'S COMPLAINT FOR DAMAGES

bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax

83.    PRISCILA VILCHIS is an individual, older than 18 years of age, capable of holding a legal or beneficial interest in property.  Ms. Vilchis directed ELITE to accept money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.  Ms. Vilchis also accepted money from Pharmacy Defendants to help MELAMED conceal his interest in such money and/or directed ELITE to do so.

84.    ELITE is a corporation capable of holding a legal or beneficial interest in property.  ELITE accepted money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

85.    JAMES PETERSON is an individual, older than 18 years of age, capable of holding a legal or beneficial interest in property.  Mr. Peterson directed MCNAA and GREYSON to accept money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

86.    MCNAA is a corporation capable of holding a legal or beneficial interest in property.  MCNAA accepted money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

87.    RUDY PULIDO is an individual, older than 18 years of age, capable of holding a legal or beneficial interest in property.  Mr. Peterson

directed ALLIED to accept money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

88.  ALLIED is a corporation capable of holding a legal or beneficial interest in property.  ALLIED accepted money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

89.  TOM MANSOR is an individual, older than 18 years of age, capable of holding a legal or beneficial interest in property.  Mr. Mansor directed PROGRESSIVE to accept money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

90.  PROGRESSIVE is a corporation capable of holding a legal or beneficial interest in property.  ALLIED accepted money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

91.  LEADER is a corporation capable of holding a legal or beneficial interest in property. LEADER accepted money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

92.  TURNING POINT is a corporation capable of holding a legal or beneficial interest in property.  TURNING POINT accepted money from MELAMED to bribe Doctor Defendants and instructed Doctor Defendants to write prescriptions directed to MELAMED's e-fax.

### 3. *Distributors: Pharmacy Defendants*

93.   Defendant ROXSAN is a corporation capable of holding a legal or beneficial interest in property.  ROXSAN is a pharmacy that paid money to MELAMED, LOUIS TAYLOR, VENTURE, SUPA, SHAHLA, and Houshang Melamed in exchange for MELAMED procuring prescriptions for products by causing Doctor Defendants to be bribed.

94.   Defendant SHAHLA is an individual, older than 18 years of age, capable of holding a legal or beneficial interest in property.  SHAHLA directed ROXSAN to make illegal payments to MELAMED, LOUIS TAYLOR, VENTURE, SUPA, herself, and her husband Houshang Melamed, in exchange for MELAMED procuring prescriptions for products by bribing Doctor Defendants.

95.   NEW AGE is a corporation capable of holding a legal or beneficial interest in property.  NEW AGE is a pharmacy that paid money to MELAMED, LOUIS TAYLOR, VENTURE, SUPA, SHAHLA, and Houshang Melamed in exchange for MELAMED procuring prescriptions for products by causing Doctor Defendants to be bribed.

96.   PRESTIGE is a corporation capable of holding a legal or beneficial interest in property.  PRESTIGE is a pharmacy that paid money to MELAMED, LOUIS TAYLOR, VENTURE, SUPA, SHAHLA, and Houshang Melamed in exchange for MELAMED procuring prescriptions for products by causing Doctor Defendants to be bribed.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

1

2 **B. Enterprise**

3    97.   RICO defines an enterprise as "any individual, partnership,

4 corporation, association or other legal entity, and any union or group of

5 individuals associated in fact although not a legal entity."  Courts have

6 interpreted this broadly.  Defendants in RICO actions must have had "some

7 knowledge of the nature of the enterprise . . . to avoid an unjust association

8 of the defendant[s] with the crimes of others," but the requirement of a

9 common purpose may be met so long as the defendants were "each aware of

10 the essential nature and scope of [the] enterprise and intended to

11 participate in it." *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir.

12 2015)

13    98.   The Defendants were engaged in an enterprise-in-fact whereby

14 MELAMED, Marketer Defendants, Doctor Defendants, and Pharmacy

15 Defendants used bribes and kickbacks to benefit at the expense of patients,

16 insurers, and the government.

17    99.   Attached to this complaint as Figure 1 is a graphical

18 representation of the enterprise.

19    100.  MELAMED gave money to Marketer Defendants to bribe Doctor

20 Defendants.

21    101.  Marketer Defendants negotiated with Doctor Defendants a

22 payment based upon the number of prescriptions written and submitted to

23 Melamed's e-fax account.  Marketer Defendants paid Doctor Defendants for

24 those prescriptions with the money they received from MELAMED.

25

102.   MELAMED, as administrator of his e-fax account, directed prescriptions from Doctor Defendants to Pharmacy Defendants.   Initially, Melamed directed all of those prescriptions to NEW AGE (an entity owned by Melamed's wife) and ROXSAN, an entity owned by Melamed's mother, SHAHLA.   In or around September 2014 Melamed began divorce proceedings with his wife.   In or around August of 2015, SHAHLA sold ROXSAN.   Thereafter, Melamed directed prescriptions to other out-of-State entities including PORTLAND, rather than NEW AGE and ROXSAN and continued to do so until approximately February of 2016.

103.   Pharmacy Defendants sold products to patients and received reimbursement for those products from insurers and the U.S. and California governments.   For having sent them business, Pharmacy Defendants paid MELAMED a kickback.   Pharmacy Defendants conveyed this kickback to SHAHLA, LOUIS TAYLOR, VENTURE, and/or SUPA to conceal MELAMED's beneficial interest.

104.   Defendants knew of the nature of the enterprise because they all had to take affirmative action to receive money from the scheme, which they did.

105.   MELAMED was actively managing the enterprise by paying and directing marketers and negotiating kickbacks with Pharmacy Defendants.

106.   Pharmacy Defendants were aware of the source of the prescriptions because they negotiated MELAMED's kickback and did in fact pay to MELAMED a kickback that they would not otherwise in the ordinary course of business have paid.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

107.  Marketer Defendants were aware of the enterprise because they received payment from their active solicitation of prescriptions from Doctor Defendants and negotiated kickbacks with MELAMED for themselves and with Doctor Defendants in exchange for prescriptions.

108.  Doctor Defendants were aware of the enterprise because they received payment conditioned upon their writing prescriptions delivered as directed.

### C. Interstate or Foreign Commerce

109.  Interstate or foreign commerce under RICO is established if either the activity of the enterprise or the predicate acts of racketeering affect interstate commerce.  The nexus required under RICO is minimal.

110.  Defendants' criminal scheme affected interstate commerce because it occurred through pharmacies and through the use of marketers located outside of the State of California, including Nevada and Oregon.

111.  Out-of-State Pharmacy Defendants, such as PRESTIGE would fill prescriptions outside of the State of California and send those products back into the State of California.

112.  Out-of-State Marketer Defendants, such as VOYAGE, SUPA, and LOUIS TAYLOR, operated out of the State of Oregon in both soliciting and bribing Doctor Defendants and transfer funds into the State of California.

113.  Out-of-State Marketer Defendants, such as MCNAA, and JAMES PETERSON, operated out of the State of Nevada in both soliciting

and bribing Doctor Defendants and transfer funds into the State of California.

114. Out-of-State Marketer Defendants, such as VOYAGE, SUPA, and LOUIS TAYLOR, operating out of the State of Oregon also participated in accepting money from Pharmacy Defendants, held for the benefit of MELAMED and to conceal MELAMED's activity, in their accounts in the State of Oregon.

**D. Racketeering Activity**

115. RICO defines racketeering activity as any of the enumerated offenses set forth in section 1961(1), including 18 U.S.C. § 1341 and 18 U.S.C. § 1952. Guilt is not necessary. The conduct need only be "chargeable" or "indictable." 18 U.S.C. § 1961(1).

116. As set forth in the attached Exhibit A, Melamed and certain of the Marketing Defendants have actually been indicted under sections 18 U.S.C. § 1341 and 18 U.S.C. § 1952. Because the same scheme, same conduct, and same conspiracy alleged against Melamed in Exhibit A is the basis for the liability sought by this complaint against all Defendants, the element of Racketeering Activity is met as to all Defendants herein.

117. Moreover, any act or threat of bribery chargeable under State law and punishable by imprisonment for more than one year also meets the definition of "racketeering activity" set forth in 18 U.S.C. § 1961(1).

118. In California, commercial bribery in excess of $1,000 carries a possible criminal sentence of up to three years. Cal. Pen. Code § 641.3.

119. Here, Defendants were engaged in a scheme to bribe Doctor Defendants and to pay and accept kickbacks for directed prescriptions received through the bribery of Doctor Defendants in amounts exceeding $1,000 as set forth in further detail below. Thus, Defendants were also engaged in bribery within the definition of racketeering activity set forth in the RICO statute.

### E. Pattern

120. RICO defines a pattern as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). To establish a "pattern of racketeering activity," the predicate acts must be both "related" and "continuous." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992).

121. Related conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

122. Plaintiffs must prove either "open-ended" or "closed-ended" continuity—that is, a plaintiff must either prove a series of related predicate acts committed over a substantial period of time (known as closed-ended continuity), or show past conduct that by its nature projects into the future with a threat of repetition (known as open-ended continuity). *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241-42 (1989). There is no bright line rule for what period of time the pattern of activity must extend to

establish closed-ended continuity. *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir.1995).

123.  Defendants have been engaged in the indictable conduct described in this complaint began at the latest in August of 2012 and ended at the earliest in February of 2016.

### 1. Specific Conduct Discovered in the Indictment

124.  In furtherance of the conspiracy and in order to affect the objects thereof, the defendants and others committed or caused the commission of the following overt acts in the Southern District of California and elsewhere:

125.  On or about August 9, 2012, in a telephone call, PICARD offered to pay a marketer $125 per compound cream prescription the marketer could get a doctor to prescribe, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

126.  On or about August 20, 2012, PICARD offered to pay a marketer a "guaranteed [$]200 per script" if the marketer could find doctors who would prescribe compound creams to workers' compensation patients, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

127.  On or about December 12, 2012, PICARD offered a marketer a 25 percent kickback of the proceeds on any creams that the marketer could get doctors to prescribe, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

128.  In or about March 2013, PICARD explained to a marketer that the compound creams cost around $20 to produce, but that they could bill

the insurance company $3,000 for a "five-pack" of pharmaceuticals that were formulated to contain the highest-priced medications.

129. In or about March 2013, PICARD suggested that a marketer offer to pay the prescribing doctor between $100 and $150 to prescribe a "five-pack" of prescriptions offered by MELAMED's pharmacy.

130. In or about March 2013, PICARD directed a marketer to fax compound cream prescriptions to a fax number for NEW AGE

131. On or about March 26, 2013, in a telephone call, PICARD requested information about patients that had been procured as a result of a bribe, so that NEW AGE could bill the Department of Labor for prescription pharmaceuticals for those patients.

132. On or about March 27, 2013, MELAMED caused $4,497.77 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that MELAMED had bribed a doctor to prescribe.

133. On or about March 28, 2013, MELAMED caused $2,613.60 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that he had bribed a doctor to prescribe.

134. On or about March 30, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

135. On or about April 4, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

136.  On or about April 11, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

137.  On or about May 2, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego

138.  On or about May 9, 2013, MELAMED caused $10,740.28 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that he had bribed a doctor to prescribe.

139.  On or about July 23, 2013, MELAMED and PICARD and others caused prescription pharmaceuticals that were prescribed due to payment of kickbacks and bribes to be mailed to a location in San Diego.

140.  On or about October 17, 2013, MELAMED caused $1,476.00 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that he had bribed a doctor to prescribe.

141.  On or about November 26, 2013, MELAMED caused $1,476.00 to be billed to the U.S. Department of Labor's workers' compensation program for pharmaceuticals that he had bribed a doctor to prescribe.

142.  On or about June 24, 2014, PENA gave a doctor gift cards totaling $1,050 in value, in payment for 42 MRI scans that the doctor had referred to DOES 1-10.

143.  On or about August 1, 2014, PENA gave a doctor a gift card for $725, in payment for 29 MRI scans that the doctor had referred to DOES 1-10.

144.  On or about April 15, 2014, TRAN and PANGELINAN caused DOES 1-10 to send a claim for $1,375.31 for DME for patient Michael W., that was referred to DOES 1-10 due to payment of kickbacks and bribes, to be sent to an insurance company in San Diego.

145.  On or about August 21, 2014, TRAM and PANGELINAN caused DOES 1-10 to send a claim for $1,375.31 for DME for patient Maria H., that was referred to DOES 1-10 due to payment of kickbacks and bribes, to be sent to an insurance company in San Diego.

146.  On or about August 14, 2014, TRAN and PANGELINAN causes DOES 1-10 to send a claim for $1,375.31 for DME for patient Francisco C., that was referred to DOES 1-10 due to payment of kickbacks and bribes, to be sent to an insurance company in San Diego.

147.  On or about November 29, 2014, MELAMED caused NEW AGE to send to an insurer in San Diego a claim for reimbursement for prescription pharmaceuticals (for patient Edgar M.).

148.  On or about December 13, 2014, MELAMED caused NEW AGE to send to an insurer in San Diego a claim for reimbursement for prescription pharmaceuticals (for patient Clara S.).

149.  On or about December 13, 2014, MELAMED caused NEW AGE to send to an insurer in. San Diego a claim for reimbursement for prescription pharmaceuticals (for patient Fidel V).

150.  On or about October 28, 2015, MELAMED paid a marketer a total of $75,810 for 390 compound creams and 331 Terocin patches

prescribed in September 2015 by doctors recruited by the marketer or those working with him.

151.  On or about October 29, 2015, PANGELINAN accepted $20,130.50 as his share of the kickback paid by MELAMED, for 237 creams and 237 Terocin patches that PANGELINAN's doctors prescribed.

152.  On or about November 4, 2015, TRAN asked PENA to send kickback money to a separate marketing company, because TRAN did not want the money going directly to him.

153.  On or about November 4, 2015, TRAN asked PENA to send him a text message that used the code "Let's meet at one [o'clock]" if PENA would pay $100 per compound cream prescription, or "two [o'clock]" if PENA would pay $200.

154.  In November 2015, TRAN and PANGELINAN discussed a bribe payment of over $100 per cream prescribed.

155.  On or about November 16, 2015, PANGELINAN delivered to TRAN or TRAN's representative a check for $10,000 made out to "Team Enterprise," in payment for 50 IF Units referred by TRAN to DOES 1-10

156.  On or about November 19, 2015, PANGELINAN accepted a check for $11,565.06 in payment for the DME referrals he had caused doctors to make to DOES 1-10 in October 2015.

157.  On or about November 20, 2015, MELAMED paid a marketer a total of $75,900 for 387 compound creams and 339 Terocin patches prescribed by doctors recruited by that marketer and those working with him in October 2015.

1
2
3

158. On or about November 24, 2015, PANGELINAN suggested a new kickback deal with TRAN, to pay TRAN over $100 for each compound cream prescription that TRAN prescribed to MELAMED'S Pharmacies.

4
5
6
7
8

159. On or about November 24, 2015, PANGELINAN offered to tell doctors that he worked with, including Dr. F and Dr. Y, and their staff, that they should conceal the fact that the doctors were supposed to prescribe a certain amount of DME for the monthly payments received from DOES 1-10.

9
10
11

160. On or about November 24, 2015, PANGELINAN accepted $17,037.50 as his share of the kickback paid by MELAMED, for 254 creams and 252 Terocin patches that PANGELINAN's doctors prescribed.

12
13
14
15

161. Sometime before December 2015, TRAN and PANGELINAN agreed that TRAN would receive $10,000 per month (disguised as payment for "marketing" services) in exchange for referring 50 IF Units per month to DOES 1-10

16
17
18
19
20

162. On or about December 8, 2015, TRAN said that he would be sending many more DME referrals to DOES 1-10, and in order for DOES 1-10 to "catch up" on payments due him, TRAN suggested that he only have to refer 40 IF Units per month in exchange for the $10,000 monthly payment from DOES 1-10.

21
22
23
24

163. On or about December 8, 2015, TRAN and PANGELINAN agreed that TRAN would be paid $125 per compound cream that he prescribed and sent to PANGELINAN, to be filled by a pharmacy designated by MELAMED.

25

164. On or about December 15, 2015, PANGELINAN delivered to TRAN or TRAN's representative a check for $10,000 made out to "Team Enterprise," in payment for 50 IF Units referred by TRAM to DOES 1-10.

165. On or about December 17, 2015, PANGELINAN accepted a check for $7,506.34 in payment for the DME referrals he had caused doctors to make to DOES 1-10 in November 2015.

166. In or around December 2015, TRAN started a new marketing company so that he could receive kickback payments.

167. In or about December 2015, MELAMED agreed to pay $175 per compound cream prescription to a marketer so that TRAN, in turn, could be paid $125 per prescription for prescribing compound creams to be filled by a pharmacy designated by MELAMED.

168. On or about December 14, 2015, MELAMED paid a marketer a total of $77,900 for 412 compound creams and 314 Terocin patches prescribed in November 2015 by doctors recruited by the marker or those working with him.

169. On or about December 16, 2015, PANGELINAN accepted $18,462.50 as his share of the kickback paid by MELAMED, for 256 creams and 256 Terocin patches that PANGELINAN's doctors prescribed.

170. On or about January 29, 2016, MELAMED paid a marketer a total of $64,150 for 335 compound creams and 278 Terocin patches prescribed in December 2015 by doctors recruited by the marketer or those working with him.

171.  On or about January 14, 2016, PANGELINAN accepted a check for $8,610.86 in payment for the DME referrals he had caused doctors to make to DOES 1-10 in December 2015

### 2.   *Additional Conduct Discovered Since the Indictment*

172.  Upon information and belief, MCNAA paid bribes to Doctor Defendants to send prescriptions to MELAMED's e-fax account from which MELAMED sent them to his selected Pharmacy Defendants during the months of July through October of 2015.

173.  MELAMED paid MCNAA for this conduct $9,000 in August of 2015; $7,000 in September of 2015; and $14,000 in October of 2015.

174.  Upon information and belief, ELITE paid bribes to Doctor Defendants to send prescriptions to MELAMED's e-fax account from which MELAMED sent them to his selected Pharmacy Defendants during the months of January of 2015 through February of 2016.

175.  MELAMED paid ELITE for this conduct $22,450 in January 2015; $28,229 in February 2015; $19,785 in March 2015; $29,140 in April 2015; $32,140 in May 2015; $27,675 in June 2015; $31,984 in July 2015; $9,161 in August 2015; $4,125 in September 2015; $5,311 in October 2015; $636,990 in December 2015; $439,300 in January 2016; and $100,000 in February 2016.

176.  Upon information and belief, TURNING POINT paid bribes to Doctor Defendants to send prescriptions to Melamed's e-fax account from which MELAMED sent them to his selected Pharmacy Defendants from ALEXSO's account during the months of November and December of 2015.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

177.  MELAMED paid TURNING POINT for this conduct $20,000 in December 2015.

178.  Upon information and belief, LEADER paid bribes to Doctor Defendants to send prescriptions to MELAMED's e-fax account from which Melamed sent them to his selected Pharmacy Defendants during the months of November and December of 2015.

179.  MELAMED paid LEADER for this conduct $5,000 in December 2015.

180.  Upon information and belief, PORT MEDICAL paid bribes to Doctor Defendants to send prescriptions to MELAMED's e-fax account from which MELAMED sent them to his selected Pharmacy Defendants during the months of November and December of 2015.

181.  MELAMED paid PORT MEDICAL for this conduct $30,000 in December 2015.

182.  Upon information and belief, ALLIED paid bribes to Doctor Defendants to send prescriptions to MELAMED's e-fax account from which MELAMED sent them to his selected Pharmacy Defendants during the months of November and December of 2015.

183.  MELAMED paid ALLIED for this conduct $82,500 in December 2015.

184.  As set forth herein and in the indictment attached hereto as Exhibit A, Defendants' activity spans a time frame of at least three years in which repeated instances of bribing doctors to fill prescriptions at select pharmacies, determined by MELAMED, in coordination with Marketer

Defendants, Pharmacy Defendants, and Doctor Defendants was regularly conducted.

185. As set forth herein and in the indictment attached hereto as Exhibit A, Defendants' acts of bribing doctors, influencing prescriptions, and accepting and paying kickbacks, were related to the overarching criminal enterprise-in-fact by which Defendants attempted to divert sales to certain Pharmacy Defendants and each divide the additional profits made by such diverted sales.

## F. Standing/Causation

186. To establish standing to bring a RICO claim, the Plaintiff must be (1) a person, (2) who sustains injury, (3) to his or her business or property, and (4) by reason of defendant's violation of § 1962.

187. But-for causation is a necessary, but not sufficient element of RICO standing. A plaintiff must also show that its harm was proximately caused by Defendant's conduct. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). However, this does not mean that a plaintiff's harm need always be the objective of the criminal scheme. *See e.g.*, *Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.*, 712, F.3d 21, 36-37 (1st Cir. 2013); *Pharmacare v. Caremark*, 965 F. Supp. 1411, (D. Haw. Dec. 12, 1996) ("Defendants' alleged perpetration of fraud on its patients could foreseeably affect the Plaintiffs who are also trying to entice those same customers.").

188. The Enterprise set forth in paragraphs 97 through 108 of this complaint, utilized at least one of ALEXSO's products, its popular Terocin Patch, to achieve its objective.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

189. Entirely unrelated to the Enterprise, the Terocin Patch was positioned to have a competitive advantage in the market because of its functionality and its being (i) exclusive to ALEXSO; (ii) properly registered; (iii) listed with First Data Bank; and (iv) the subject of ALEXSO's marketing efforts.

190. Instead, as a result of Defendants' conduct as set forth in this complaint, sales of the Terocin Patch have declined. By way of example, sales declined by an average of 7,536 units per month in the six months following Melamed's indictment. This represents a loss of gross sales in the amount of $1,356,480 during that six month period.

191. Additionally, ALEXSO has spent approximately $65,000 per year advertising Terocin Patch over the course of the last three years the value of which is lost.

192. Thus, as a result of the enterprise activity, ALEXSO has been damaged in the amount of lost sales of Terocin Patch and the damage to the value of the trademark of Terocin Patch.

193. To date, ALEXSO estimates damages a result of Defendants' violation of RICO as reflected by the decrease in orders of Terocin Patch and damage to ALEXSO's intellectual property in the name Terocin at an amount between three and five million dollars.

## VI.   COUNT 1: RICO §1962(c)

194. The allegations of paragraphs 1 through 193 are incorporated herein by reference.

195.   The scheme set forth in paragraphs 97 through 108 of this complaint is an enterprise engaged in and whose activities affect interstate commerce (hereafter "the Enterprise").

196.   Defendants are employed by or associated with the Enterprise.

197.   Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.

198.   Melamed conducted and participated in the conduct of the affairs of the enterprise as set forth above.

199.   Pharmacy Defendants conducted and participated in the conduct of the affairs of the enterprise as set forth above.

200.   Marketer Defendants conducted and participated in the conduct of the affairs of the enterprise as set forth above.

201.   Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of bribery.

202.   Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts in violation of the Travel Act.

203.   The acts of bribery and violation of the Travel Act set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

204.   Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above in violation of 18 U.S.C. § 1962(c).

205.   As a direct and proximate cause of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), ALEXSO has been injured

ALEXSO, INC'S COMPLAINT FOR DAMAGES

in its business and property as set forth in paragraphs 61 through 73, and 186 through 193 of this Complaint.

206. WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants in the amount of "threefold damages," interest, costs, and attorneys' fees estimated at this time to exceed fifteen million dollars ($15,000,000).

## VII.   COUNT II: RICO §1962(d)

207. The allegations of paragraphs 1 through 192 are incorporated herein by reference.

208. The scheme set forth in paragraphs 97 through 108 of this complaint is an enterprise engaged in and whose activities affect interstate commerce (hereafter "the Enterprise").

209. As set forth above Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Defendants intentionally conspired and agreed to directly and indirectly participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

210. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

211. As a direct and proximate cause of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), ALEXSO has been injured in its business and property as set forth in paragraphs 61 through 73, and 186 through 193 of this Complaint.

212. WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants in the amount of "threefold damages," interest, costs, and attorneys' fees estimated at this time to exceed fifteen million dollars ($15,000,000).

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against all Defendants follows:

A.  For compensatory damages in an amount subject to proof at trial

B.  For treble damages in an amount subject to proof at trial

C.  For costs of suit, including reasonable attorneys' fees' and

D.  For such other and further relief as the Court deems just and equitable.

Dated:  January 30, 2018            TROY M. MUELLER
                                    LAW OFFICES OF TROY M. MUELLER


                                    By:   /s/ Troy M. Mueller
                                          Troy M. Mueller

                                    Attorneys for Plaintiff
                                    ALEXSO, INC.

ALEXSO, INC'S COMPLAINT FOR DAMAGES

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in this action pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment of the Constitution.

Dated: January 30, 2018            TROY M. MUELLER
                                   LAW OFFICES OF TROY M. MUELLER


                                   By:    /s/ Troy M. Mueller
                                          Troy M. Mueller

                                   Attorneys for Plaintiff
                                   ALEXSO, INC.

ALEXSO, INC'S COMPLAINT FOR DAMAGES