# Exhibit "A"

# ORIGINAL

**CASE UNSEALED PER ORDER OF COURT**

**FILED**

2016 JUN 16  PM 4:44

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ a.c.c
DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2016 Grand Jury

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

HOOTAN MELAMED (1),
JEAN FRANCOIS PICARD (2),
JOHN PANGELINAN (3),
PHONG HUNG TRAN (4),
JONATHAN PENA (5),

      Defendants.

Case No. **16 CR 1409 H**

# I N D I C T M E N T

Title 18, U.S.C., Sec. 371 –
Conspiracy; Title 18, U.S.C.,
Secs. 1341 and 1346 – Honest
Services Mail Fraud; Title 18,
U.S.C., Sec. 1952(a)(1) and
(a)(2) – Travel Act; Title 18,
U.S.C., Sec. 2 – Aiding and
Abetting; Title 18, U.S.C.,
Sec. 981(a)(1)(C) and
Title 28, U.S.C., Sec. 2461(c) –
Criminal Forfeiture

The Grand Jury charges, at all times relevant:

### INTRODUCTORY ALLEGATIONS

1. Defendant HOOTAN MELAMED was a pharmacist licensed with the state of California. He operated and was the de facto owner of New Age Pharmaceuticals, Inc., ("New Age") a compounding pharmacy located in Beverly Hills, California. He also had business interests in other pharmacies, including RoxSan Pharmacy, Inc. ("RoxSan"), Concierge Compounding Pharmaceuticals, Inc. ("Concierge"), Alexso, Inc., and Portland Professional Pharmacy ("Portland Pharmacy") (together, "Melamed's Pharmacies"). These compound pharmacies supplied compound creams and other custom pharmaceuticals to patients.

VHC:nlv(1):San Diego
6/16/16
    cc: PRETRIAL

1   2.   Defendant JEAN FRANCOIS PICARD was a "medical marketer,"
2   operating through C.A.S.E., LLC, Versatile Healthcare and Dignity
3   Consultants.   Among the products that he "marketed" were compound
4   creams for Melamed's Pharmacies.

5   3.   Defendant JOHN PANGELINAN was a "medical marketer" who
6   "marketed" durable medical equipment ("DME") for Company No. 1.   He
7   was the president of Broad Med, Inc.

8   4.   Defendant PHONG HUNG TRAN was the owner of Coastline Medical
9   Clinics in Southern California.   Dr. Tran was previously a licensed
10  physician in the State of California, but had his license suspended
11  after his arrest and indictment by the San Diego District Attorney's
12  Office in January 2016.

13  5.   Defendant JONATHAN PENA was a "medical marketer" who
14  "marketed" DME for Company No. 1, compound creams for Melamed's
15  Pharmacies, and Magnetic Resonance Image ("MRI" scans) for Company A,
16  a diagnostic imaging facility.   He operated through JP Medical
17  Marketing.

18                      FIDUCIARY DUTY OF PHYSICIANS

19  6.   Physicians, including medical doctors and chiropractors,
20  owed a fiduciary duty to their patients, requiring physicians to act
21  in their patients' best interests, and not for their own professional,
22  pecuniary, or personal gain.

23                      WORKERS' COMPENSATION PROGRAMS

24  7.   The California Workers' Compensation System ("CWCS")
25  required that employers in California provide workers' compensation
26  benefits to their employees for qualifying injuries sustained in the
27  course of their employment.   Under the CWCS, all claims for payments
28  for services or benefits provided to the injured employee, including

2

1  medical and legal fees, were billed directly to, and were paid by, the
2  insurer.   The CWCS was regulated by the California Labor Code, the
3  California Insurance Code, and the California Code of Regulations, and
4  was administered by the California Department of Industrial Relations.

5      8.   CWCS benefits were administered by the employer, an
6  insurer, or a third party administrator.   The CWCS required claims
7  administrators to authorize and pay for medical care that was
8  "reasonably required to cure or relieve the injured worker from the
9  effects of his or her injury."

10      9.   California law, including but not limited to the California
11  Business and Professions Code, the California Insurance Code, and the
12  California Labor Code, prohibited the offering, delivering,
13  soliciting, or receiving of anything of value in return for referring
14  a patient for goods or services paid for under the CWCS.

15      10.  The United States offered a workers' compensation program to
16  provide medical care to federal workers who suffer work-related
17  injuries or occupational diseases.   The program was administered by
18  the Office of Workers' Compensation Programs.   Claims are submitted to
19  the Department of Labor for adjudication and payment.

20      11.  Both California and the federal workers' compensation
21  benefits included prescription medications prescribed by a doctor.
22  Compound creams were specialty medications prescribed for patients who
23  are unable to take medications in their standard formulations (for
24  example, tablets, pills, or injections), for medications that must be
25  absorbed through the skin, or where the specific combination of
26  medicines is not available.   Compound pharmacies could custom-mix the
27  prescribed medicines into a cream to be dispensed to the patient.
28

1     12. Both California and the federal workers' compensation

2 benefits included DME prescribed by a doctor. DME was any equipment

3 that provides therapeutic benefits to a patient in need because of

4 certain medical conditions and/or illnesses. An Inferential Unit

5 ("IF Unit") was a device that provides low-level electrical

6 stimulation to a body part to encourage healing.

7     <u>Count 1</u>

8 CONSPIRACY TO COMMIT HEALTH CARE FRAUD, HONEST SERVICES MAIL FRAUD AND

9        VIOLATE THE TRAVEL ACT, 18 USC § 371

10    13. Paragraphs 1 through 12 of this Indictment are realleged and

11 incorporated by reference.

12    14. Beginning on a date unknown to the grand jury and continuing

13 through at least June 2016, within the Southern District of California

14 and elsewhere, defendants HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN

15 PANGELINAN, PHONG HUNG TRAN and JONATHAN PENA and others did knowingly

16 and intentionally conspire together and with each other and with

17 others to:

18    a.   commit Health Care Fraud, that is, to knowingly and with the

19 intent to defraud execute a material scheme to defraud a health care

20 benefit program, and to obtain by means of materially false and

21 fraudulent pretenses, representations, and promises, any of the money

22 and property owned by, and under the custody and control of a health

23 care benefit program, in connection with the delivery of and payment

24 for health care benefits, items, and services, in violation of

25 Title 18, United States Code, Section 1347;

26    b.   commit Honest Services Mail Fraud, that is, to knowingly and

27 with the intent to defraud, devise and participate in a material

28 scheme to defraud and to deprive patients of the intangible right to a

4

1  doctor's honest services, and to cause mailings in furtherance
2  thereof, in violation of Title 18, United States Code, Sections 1341
3  and 1346; and

4       c.   violate the Travel Act, that is, to use and cause to be used
5  facilities in interstate commerce with intent to promote, manage,
6  establish, carry on, distribute the proceeds of, and facilitate the
7  promotion, management, establishment, carrying on, and distribution of
8  the proceeds of an unlawful activity, that is, commercial bribery in
9  violation of California law, and, thereafter, to promote and attempt
10  to perform acts to promote, manage, establish, carry on, distribute
11  the proceeds of, and facilitate the promotion, management,
12  establishment, carrying on, and distribution of the proceeds of such
13  unlawful activity, in violation of Title 18, United States Code,
14  Sections 1952(a)(1) and (a)(3).

15                          FRAUDULENT PURPOSE

16       15.  It was the goal of the conspiracy to fraudulently obtain
17  money from health care benefit programs by submitting claims for
18  prescription pharmaceuticals and DME that were generated through a
19  secret pattern of bribes to doctors (and those acting with them and on
20  their behalf), to induce the doctors to refer patients to particular
21  pharmacies and DME providers, in violation of the doctors' fiduciary
22  duty to their patients.

23                          MANNER AND MEANS

24       16.  The conspirators used the following manner and means in
25  pursuit of their fraudulent purpose:

26       a.   It was a part of the conspiracy that defendants MELAMED,
27  PICARD, PANGELINAN and PENA, and other co-conspirators, knowing that
28  the payment of per-patient referral fees was unlawful, paid doctors to

                                5

1  recommend certain goods and services and refer workers' compensation
2  patients to specific providers for those goods and services, including
3  to pharmacies in which MELAMED had an interest for prescription
4  pharmaceuticals, to Company No. 1 for DME, and to other providers in
5  which the co-conspirators had financial interests for other goods and
6  services.

7      b.  It was a further part of the conspiracy that defendant TRAN,
8  knowing that receiving a per-patient referral fee was unlawful, agreed
9  to accept per-patient bribes from the co-conspirators to refer
10  workers' compensation patients to companies owned by his co-
11  conspirators or in which they had an interest.

12      c.  It was a further part of the conspiracy that the co-
13  conspirators paid or accepted specific bribe and kickback amounts for
14  specific kinds of prescriptions, including: between $200-250 per IF
15  Unit referral, $150-200 for each Flurbiprofen cream prescription, $150
16  for each Gabapentin cream, and $50 per Terocin patch.

17      d.  It was a further part of the conspiracy that the co-
18  conspirators bribed and solicited marketers and doctors to prescribe
19  compound creams and patches over other types of medications, because
20  these custom pharmaceuticals can be billed at high rates to insurance
21  companies.

22      e.  It was a further part of the conspiracy that the co-
23  conspirators crafted compound creams and other pharmaceuticals to
24  contain the most expensive components, in order to bill at high rates
25  to insurance companies, instead of customizing the medications to the
26  needs of particular patients.

27      f.  It was a further part of the conspiracy that the co-
28  conspirators concealed from patients, and intended to cause the

1  doctors, including Dr. TRAN, to conceal from patients, the kickback
2  and bribe payments made to doctors for referring patients to companies
3  owned by the co-conspirators or in which they had an interest, in
4  violation of the doctors' fiduciary duty to their patients.

5      g.   It was a further part of the conspiracy that the co-
6  conspirators obscured the true nature of their financial relationships
7  in order to conceal their corrupt payments for patient referrals,
8  including by entering sham agreements to purportedly lease office
9  space or provide marketing services, when in reality the corrupt
10  payments were made in exchange for, or to induce, the referral of
11  patients.

12      h.   It was a further part of the conspiracy that the co-
13  conspirators, knowing that the payment of per-patient referral fees
14  was unlawful, inserted intermediaries (referring to them as
15  "marketers" or "marketing companies") to hide and obscure the flow of
16  payments from providers to doctors, when in reality the payments were
17  unlawful volume-based, per-patient referral fees.

18      i.   It was a further part of the conspiracy that the co-
19  conspirators obscured the true nature of their financial relationships
20  in order to conceal their corrupt payments for patient referrals,
21  including by creating separate companies in the names of nominees and
22  straw owners, to pay and receive kickback and bribe money.

23      j.   It was a further part of the conspiracy that, knowing that
24  per-patient referral fees were unlawful, the co-conspirators disguised
25  their bribes and kickbacks to doctors by providing gift cards,
26  vacations, sports tickets, cash, or patient referrals.

27      k.   It was a further part of the conspiracy that MELAMED, after
28  paying doctors and marketers kickbacks and bribes to prescribe

7

1  compound creams, then filled the prescriptions himself through New
2  Age, or sent those prescriptions to other pharmacies to be filled,
3  including RoxSan, Concierge, or Portland, in exchange for a further
4  kickback from those pharmacies.

5      l.    It was a further part of the conspiracy that the co-
6  conspirators discussed via telephone calls, emails, and in-person
7  meetings the workers' compensation patients who had been corruptly
8  referred for goods and services in exchange for kickbacks.

9      m.    It was a further part of the conspiracy that the co-
10 conspirators utilized interstate facilities, including cellular
11 telephones and email, in order to coordinate the referral of patients
12 for goods and services, knowing that such referrals were predicated on
13 unlawful per-patient kickback payments.

14     n.    It was a further part of the conspiracy that the co-
15 conspirators utilized the mails as an essential part of their
16 fraudulent scheme, including by mailing bills to insurance carriers,
17 and mailing prescription pharmaceuticals and DME to patients.

18     o.    It was a further part of the conspiracy that co-conspirators
19 billed, and caused insurers to bill, for services provided to patients
20 that the co-conspirators had procured by paying bribes and kickbacks.

21     p.    It was a further part of the conspiracy that defendants
22 concealed from insurers and patients the material fact of the kickback
23 arrangements, which were in violation of California state law, that
24 led to the referrals.

25     q.    Using the manners and means described above, defendants
26 submitted and caused to be submitted claims of over $27 million for
27 pharmaceutical prescriptions and over $7.6 million in DME
28 prescriptions procured through the payment of bribes and kickbacks.

8

## OVERT ACTS

17.   In furtherance of the conspiracy and in order to effect the objects thereof, the defendants and others committed or caused the commission of the following overt acts in the Southern District of California and elsewhere:

a.   On or about August 9, 2012, in a telephone call, PICARD offered to pay a marketer $125 per compound cream prescription the marketer could get a doctor to prescribe, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

b.   On or about August 20, 2012, PICARD offered to pay a marketer a "guaranteed [$]200 per script" if the marketer could find doctors who would prescribe compound creams to workers' compensation patients, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

c.   On or about December 12, 2012, PICARD offered a marketer a 25 percent kickback of the proceeds on any creams that the marketer could get doctors to prescribe, which would be filled by MELAMED and fraudulently billed to an insurance carrier.

d.   In or about March 2013, PICARD explained to a marketer that the compound creams cost around $20 to produce, but that they could bill the insurance company $3,000 for a "five-pack" of pharmaceuticals that were formulated to contain the highest-priced medications.

e.   In or about March 2013, PICARD suggested that a marketer offer to pay the prescribing doctor between $100 and $150 to prescribe a "five-pack" of prescriptions offered by MELAMED's pharmacy.

f.   In or about March 2013, PICARD directed a marketer to fax compound cream prescriptions to a fax number for New Age.

9

1  g. On or about March 26, 2013, in a telephone call, PICARD
2 requested information about patients that had been procured as a
3 result of a bribe, so that New Age could bill the Department of Labor
4 for prescription pharmaceuticals for those patients.

5  h. On or about March 27, 2013, MELAMED caused $4,497.77 to be
6 billed to the U.S. Department of Labor's workers' compensation program
7 for pharmaceuticals that MELAMED had bribed a doctor to prescribe.

8  i. On or about March 28, 2013, MELAMED caused $2,613.60 to be
9 billed to the U.S. Department of Labor's workers' compensation program
10 for pharmaceuticals that he had bribed a doctor to prescribe.

11  j. On or about March 30, 2013, MELAMED and PICARD and others
12 caused prescription pharmaceuticals that were prescribed due to
13 payment of kickbacks and bribes to be mailed to a location in San
14 Diego.

15  k. On or about April 4, 2013, MELAMED and PICARD and others
16 caused prescription pharmaceuticals that were prescribed due to
17 payment of kickbacks and bribes to be mailed to a location in San
18 Diego.

19  l. On or about April 11, 2013, MELAMED and PICARD and others
20 caused prescription pharmaceuticals that were prescribed due to
21 payment of kickbacks and bribes to be mailed to a location in San
22 Diego.

23  m. On or about May 2, 2013, MELAMED and PICARD and others
24 caused prescription pharmaceuticals that were prescribed due to
25 payment of kickbacks and bribes to be mailed to a location in San
26 Diego.

27

28

1      n.   On or about May 9, 2013, MELAMED caused $10,740.28 to be

2   billed to the U.S. Department of Labor's workers' compensation program

3   for pharmaceuticals that he had bribed a doctor to prescribe.

4      o.   On or about July 23, 2013, MELAMED and PICARD and others

5   caused prescription pharmaceuticals that were prescribed due to

6   payment of kickbacks and bribes to be mailed to a location in San

7   Diego.

8      p.   On or about October 17, 2013, MELAMED caused $1,476.00 to be

9   billed to the U.S. Department of Labor's workers' compensation program

10  for pharmaceuticals that he had bribed a doctor to prescribe.

11     q.   On or about November 26, 2013, MELAMED caused $1,476.00 to

12  be billed to the U.S. Department of Labor's workers' compensation

13  program for pharmaceuticals that he had bribed a doctor to prescribe.

14     r.   On or about June 24, 2014, PENA gave a doctor gift cards

15  totaling $1,050 in value, in payment for 42 MRI scans that the doctor

16  had referred to Company A.

17     s.   On or about August 1, 2014, PENA gave a doctor a gift card

18  for $725, in payment for 29 MRI scans that the doctor had referred to

19  Company A.

20     t.   On or about April 15, 2014, TRAN and MANGELINAN caused

21  Company No. 1 to send a claim for $1,375.31 for DME for patient

22  Michael W., that was referred to Company No. 1 due to payment of

23  kickbacks and bribes, to be sent to an insurance company in San Diego.

24     u.   On or about August 21, 2014, TRAN and MANGELINAN caused

25  Company No. 1 to send a claim for $1,375.31 for DME for patient Maria

26  H., that was referred to Company No. 1 due to payment of kickbacks and

27  bribes, to be sent to an insurance company in San Diego.

28

1      v.   On or about August 14, 2014, TRAN and PANGELINAN caused
2  Company No. 1 to send a claim for $1,375.31 for DME for patient
3  Francisco C., that was referred to Company No. 1 due to payment of
4  kickbacks and bribes, to be sent to an insurance company in San Diego.
5      w.   On or about November 29, 2014, MELAMED caused New Age to
6  send to an insurer in San Diego a claim for reimbursement for
7  prescription pharmaceuticals (for patient Edgar M.).
8      x.   On or about December 13, 2014, MELAMED caused New Age to
9  send to an insurer in San Diego a claim for reimbursement for
10  prescription pharmaceuticals (for patient Clara S.).
11      y.   On or about December 13, 2014, MELAMED caused New Age to
12  send to an insurer in San Diego a claim for reimbursement for
13  prescription pharmaceuticals (for patient Fidel V).
14      z.   On or about October 28, 2015, MELAMED paid a marketer a
15  total of $75,810 for 390 compound creams and 331 Terocin patches
16  prescribed in September 2015 by doctors recruited by the marketer or
17  those working with him.
18      aa.  On or about October 29, 2015, PANGELINAN accepted $20,130.50
19  as his share of the kickback paid by MELAMED, for 237 creams and 237
20  Terocin patches that PANGELINAN's doctors prescribed.
21      bb.  On or about November 4, 2015, TRAN asked PENA to send
22  kickback money to a separate marketing company, because TRAN did not
23  want the money going directly to him.
24      cc.  On or about November 4, 2015, TRAN asked PENA to send him a
25  text message that used the code "Let's meet at one [o'clock]" if PENA
26  would pay $100 per compound cream prescription, or "two [o'clock]" if
27  PENA would pay $200.
28

1    dd.   In November 2015, TRAN and PANGELINAN discussed a bribe
2  payment of over $100 per cream prescribed.

3    ee.   On or about November 16, 2015, PANGELINAN delivered to TRAN
4  or TRAN's representative a check for $10,000 made out to "Team
5  Enterprise," in payment for 50 IF Units referred by TRAN to Company
6  No. 1.

7    ff.   On or about November 19, 2015, PANGELINAN accepted a check
8  for $11,565.06 in payment for the DME referrals he had caused doctors
9  to make to Company No. 1 in October 2015.

10    gg.   On or about November 20, 2015, MELAMED paid a marketer a
11  total of $75,900 for 387 compound creams and 339 Terocin patches
12  prescribed by doctors recruited by that marketer and those working
13  with him in October 2015.

14    hh.   On or about November 24, 2015, PANGELINAN suggested a new
15  kickback deal with TRAN, to pay TRAN over $100 for each compound cream
16  prescription that TRAN prescribed to MELAMED'S Pharmacies.

17    ii.   On or about November 24, 2015, PANGELINAN offered to tell
18  doctors that he worked with, including Dr. F and Dr. Y, and their
19  staff, that they should conceal the fact that the doctors were
20  supposed to prescribe a certain amount of DME for the monthly payments
21  received from Company No. 1.

22    jj.   On or about November 24, 2015, PANGELINAN accepted
23  $17,037.50 as his share of the kickback paid by MELAMED, for 254
24  creams and 252 Terocin patches that PANGELINAN's doctors prescribed.

25    kk.   Sometime before December 2015, TRAN and PANGELINAN agreed
26  that TRAN would receive $10,000 per month (disguised as payment for
27  "marketing" services) in exchange for referring 50 IF Units per month
28  to Company No. 1.

1     11.   On or about December 8, 2015, TRAN said that he would be
2  sending many more DME referrals to Company No. 1, and in order for
3  Company No. 1 to "catch up" on payments due him, TRAN suggested that
4  he only have to refer 40 IF Units per month in exchange for the
5  $10,000 monthly payment from Company No. 1.

6     mm.   On or about December 8, 2015, TRAN and PANGELINAN agreed
7  that TRAN would be paid $125 per compound cream that he prescribed and
8  sent to PANGELINAN, to be filled by a pharmacy designated by MELAMED.

9     nn.   On or about December 15, 2015, PANGELINAN delivered to TRAN
10 or TRAN's representative a check for $10,000 made out to "Team
11 Enterprise," in payment for 50 IF Units referred by TRAN to Company
12 No. 1.

13    oo.   On or about December 17, 2015, PANGELINAN accepted a check
14 for $7,506.34 in payment for the DME referrals he had caused doctors
15 to make to Company No. 1 in November 2015.

16    pp.   In or around December 2015, TRAN started a new marketing
17 company so that he could receive kickback payments.

18    qq.   In or about December 2015, MELAMED agreed to pay $175 per
19 compound cream prescription to a marketer so that TRAN, in turn, could
20 be paid $125 per prescription for prescribing compound creams to be
21 filled by a pharmacy designated by MELAMED.

22    rr.   On or about December 14, 2015, MELAMED paid a marketer a
23 total of $77,900 for 412 compound creams and 314 Terocin patches
24 prescribed in November 2015 by doctors recruited by the marker or
25 those working with him.

26    ss.   On or about December 16, 2015, PANGELINAN accepted
27 $18,462.50 as his share of the kickback paid by MELAMED, for 256
28 creams and 256 Terocin patches that PANGELINAN's doctors prescribed.

1    tt.   On or about January 29, 2016, MELAMED paid a marketer a
2 total of $64,150 for 335 compound creams and 278 Terocin patches
3 prescribed in December 2015 by doctors recruited by the marketer or
4 those working with him.

5    uu.   On or about January 14, 2016, PANGELINAN accepted a check
6 for $8,610.86 in payment for the DME referrals he had caused doctors
7 to make to Company No. 1 in December 2015.

8    vv.   On or about January 14, 2016, PANGELINAN delivered to TRAN
9 or TRAN's representative a check for $10,000 made out to "Team
10 Enterprise," in payment for 40 or 50 IF Units referred by TRAN to
11 Company No. 1.

12    ww.   On or about February 18, 2016, PANGELINAN accepted a check
13 for $12,981.27 in payment for the DME referrals he had caused doctors
14 to make to Company No. 1 in January 2016.

15    xx.   On or about February 29, 2016, MELAMED caused New Age to
16 send to an insurer in San Diego a claim for reimbursement for
17 prescription pharmaceuticals (for patient Edgar M.).

18    yy.   On or about March 1, 2016, MELAMED paid a marketer a total
19 of $54,900 for 273 compound creams and 278 Terocin patches prescribed
20 in January 2016 by doctors recruited by the marketer or those working
21 with him..

22    zz.   On or about March 3, 2016, PANGELINAN accepted $12,768.75
23 as his share of the kickback paid by MELAMED, for 234 creams and 234
24 Terocin patches that PANGELINAN's doctors prescribed.

25    aaa.   On or about March 16, 2016, PANGELINAN accepted a check for
26 $9,469.34 in payment for the DME referrals he had caused doctors to
27 make to Company No. 1 in February 2016.

28

1    bbb.  In or about April 2016, over telephone conversations and
2  telephone communications, MELAMED agreed to pay a total of $74,300 for
3  412 compound creams and 250 Terocin patches prescribed by doctors
4  recruited by a marketer or those working with him in March 2016.

5    ccc.  On or about April 18, 2016, PANGELINAN accepted a check for
6  $10,786.03 in payment for the DME referrals he had caused doctors to
7  make to Company No. 1 in March 2016.

8    ddd.  On or about April 22, 2016, PANGELINAN accepted $4,050 as
9  his share of the kickback paid by MELAMED, for 162 creams that
10 PANGELINAN's doctors prescribed.

11   eee.  On or about April 22, 2016, PANGELINAN delivered to a
12 doctor a check for $12,400 in payment for 124 compound creams referred
13 by that doctor to be filled by MELAMED.

14   fff.  On or about May 13, 2016, PANGELINAN accepted a check for
15 $9,140.29 in payment for the DME referrals he had caused doctors to
16 make to Company No. 1 in April 2016.

17   ggg.  On or about June 3, 2016, PANGELINAN accepted $10,050 as
18 his share of the kickback paid by MELAMED, for 124 creams that
19 PANGELINAN's doctors prescribed.

20   All in violation of Title 18, United States Code, Section 371.

21                          Counts 2 - 12

22   HONEST SERVICES MAIL FRAUD, 18 U.S.C. §§ 1341, 1346 AND 2

23   18.  Paragraphs 1 through 12 of this Indictment are realleged and
24 incorporated by reference.

25   19.  Beginning on a date unknown and continuing through at least
26 June 2016, within the Southern District of California and elsewhere,
27 defendants HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN PANGELINAN and
28 PHONG HUNG TRAN and others, knowingly and with the intent to defraud,

16

1  devised a material scheme to defraud, that is, to deprive patients of

2  their intangible right to doctors' honest services.

3      20.   Paragraphs 15 and 16 of this Indictment are realleged and

4  incorporated by reference as more fully describing the scheme to

5  defraud.

6      21.   For the purpose of executing the scheme and attempting to do

7  so, within the Southern District of California, the following

8  defendants knowingly caused to be delivered by U.S. Mail according to

9  the direction thereon the following mail matter:

| Ct. | Date | Defendants | Item(s) Mailed |
|---|---|---|---|
| 2 | 3/30/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 3 | 4/4/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 4 | 4/11/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 5 | 5/2/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 6 | 7/23/2013 | MELAMED, PICARD | Prescription pharmaceuticals prescribed due to payment of kickbacks by MELAMED and PICARD |
| 7 | 4/15/2014 | PANGELINAN, TRAN | Claim of $1375.31 for DME (for patient Michael W.) prescribed by TRAN, for which TRAN and PANGELINAN received kickbacks from Company No. 1 |
| 8 | 8/21/2014 | PANGELINAN, TRAN | Claim of $1375.31 for DME (for patient Maria H.) prescribed by TRAN, for which TRAN and PANGELINAN received kickbacks from Company No. 1 |
| 9 | 11/29/2014 | MELAMED | Claim for prescription pharmaceuticals (for patient Edgar M.) sent by New Age to an insurer |

| Ct. | Date | Defendants | Item(s) Mailed |
|---|---|---|---|
| 10 | 12/13/2014 | MELAMED | Claim for prescription pharmaceuticals (for patient Clara B.) sent by New Age to an insurer |
| 11 | 12/13/2014 | MELAMED | Claim for prescription pharmaceuticals (for patient Fidel V.) sent by New Age to an insurer |
| 12 | 8/14/2015 | FANGELINAN, TRAN | Claim of $1375.31 for DME (for patient Francisco G.) prescribed by TRAN, for which TRAN and FANGELINAN received kickbacks from Company No. 1 |

All in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## Counts 13 - 14

### TRAVEL ACT, 18 USC §§ 1952 AND 2

22.    Paragraphs 1 through 12 are realleged and incorporated by reference.

23.    Beginning on date unknown and continuing through at least June 2016, within the Southern District of California and elsewhere, defendants ROOTAN MELAMED and JEAN FRANCOIS PICARD knowingly used and cause to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, that is, bribery in violation of California Penal Code Sections 139.3-32 and California Labor Code Section 3215, and, thereafter, to promote and attempt to perform acts to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of such unlawful activity as follows:

18

| Ct. | Date | Defendants | Use of Facility in Interstate Commerce | Acts Performed Thereafter |
|---|---|---|---|---|
| 13 | 8/9/2012 | MELAMED, PICARD | Telephone call by PICARD offering to pay $125 per compound cream prescription | PICARD paid a marketer $1,053.53 for 3 sets of compound cream prescriptions filled by MELAMED |
| 14 | 3/26/2013 | MELAMED, PICARD | Telephone call by PICARD to obtain information to fill prescription and bill insurance carrier | PICARD paid a marketer $1,053.53 for 3 sets of compound cream prescriptions filled by MELAMED |

All in violation of Title 18, United States Code, Sections 1952(a)(1), (a)(2) and 2.

## FORFEITURE ALLEGATION

24.     Paragraphs 1 through 12 of this Indictment are realleged and incorporated as if fully set forth herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

25.     Upon conviction of the offenses of Conspiracy, Honest Services Mail Fraud and Travel Act as alleged in Counts 1 through 14, defendants HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN FANGELINAN, PHONG HUNG TRAN and JONATHAN PENA shall forfeit to the United States all right, title, and interest in any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of such offenses, including a sum of money equal to the total amount of gross proceeds derived, directly or indirectly, from such offenses.

1    26.   If any of the above described forfeitable property, as a
2    result of any act or omission of defendants HOOTAN MELAMED, JEAN
.3   FRANCOIS PICARD, JOHN PANGELINAN, PHONG HUNG TRAN and JONATHAN PENA:
4    (a) cannot be located upon the exercise of due diligence; (b) has been
5    transferred or sold to, or deposited with, a third party; (c) has been
6    placed   beyond   the   jurisdiction   of   the   Court;   (d)   has   been
7    substantially diminished in value; or (e) has been commingled with
8    other property which cannot be divided without difficulty;
9    it is the intent of the United States, pursuant to Title 21, United
10   States   Code,   Section   853(p)   and   Title   18,   United   States   Code,
11   Section 982(b), to seek forfeiture of any other property of defendants
12   HOOTAN MELAMED, JEAN FRANCOIS PICARD, JOHN PANGELINAN, PHONG HUNG TRAN
13   and JONATHAN PENA up to the value of the forfeitable property
14   described above.
15   All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and
16   Title 28, United States Code, Section 2461(c).
17       DATED:   June 16, 2016.

18                                              A TRUE BILL:
19
20                                              Foreperson
21   LAURA E. DUFFY
22   United States Attorney
23   By:  _____
24        VALERIE H. CHU
         Assistant U.S. Attorney
25
26
27
28

                            20